**Rebecca OTTO, in her official capacity as State Auditor of the State of Minnesota, Appellant,**

·v.

**WRIGHT COUNTY, et al., Respondents,**

**Ramsey County, Respondent.**

**A16-1634**

Court of Appeals of Minnesota.

Filed May 30, 2017

Joseph T. Dixon, Joseph J. Cassioppi, Pari I. McGarraugh, Fredrikson & Byron, P.A., Minneapolis, Minnesota (for appellant/cross-respondent Rebecca Otto).

Scott T. Anderson, John P. Edison, Elizabeth J. Vieira, Rupp, Anderson, Squires & Waldspurger, P.A., Minneapolis, Minnesota (for respondents/cross-appellants Wright County and Becker County).

John J. Choi, Ramsey County Attorney, Robert B. Roche, Assistant County Attorney, John T. Kelly, First Assistant County

Attorney, St. Paul, Minnesota (for respondent/cross-appellant Ramsey County).

William Z. Pentelovitch, Michael C. McCarthy, Melissa Muro LaMere, Maslon LLP, Minneapolis, Minnesota; and Teresa J. Nelson, American Civil Liberties Union of Minnesota, St. Paul, Minnesota (for Amici Curiae American Civil Liberties Union of Minnesota, Professor David Schultz, Growth & Justice, Honorable Jack Davies, and Jewish Community Action).

Erick G. Kaardal, Mohrman, Kaardal & Erickson, P.A., Minneapolis, Minnesota (for Amicus Curiae Association for Government Accountability)

Considered and decided by Bjorkman, Presiding Judge; Cleary, Chief Judge; and Peterson, Judge.

## OPINION

BJORKMAN, Judge

This appeal is taken from a summary-judgment ruling rejecting the constitutional challenge to Minn. Stat. § 6.481, which requires counties to have an annual financial audit and permits counties to hire private certified public accounting (CPA) firms to conduct the audits. State Auditor Rebecca Otto contends that the statute violates the Minnesota Constitution by removing a core function from her office and that the underlying session law was adopted in violation of the Single Subject Clause of the Minnesota Constitution. In a related appeal, Ramsey County asserts that the claims against it are not justiciable. We affirm.

## FACTS

Appellant/cross-respondent Rebecca Otto is the Minnesota State Auditor, a constitutional officer serving her third four-year term. A primary function of the Office of the State Auditor (OSA) is conducting and overseeing annual audits of Minnesota's 87 counties, including respondents/cross-appellants Wright County, Becker County, and Ramsey County. According to the state auditor, 64% of the OSA employees spend their time auditing counties or otherwise supporting the OSA's county-audit function. And the OSA reviews the annual use by Minnesota counties of more than $6 billion of federal, state, and local tax dollars.[1]

In recent decades, the OSA has permitted some counties to hire private CPA firms to conduct their audits. Because of its size and large hospital operation, Hennepin County has been permitted to retain private auditors since 1970. Starting in 2003, in response to funding cuts, the OSA allowed other counties to hire private CPA firms. The OSA determined which counties to audit (and which would be permitted to have private firms) on a three-year cycle. During the 2012-14 cycle, the OSA audited 59 counties and permitted 28 to obtain private audits, subject to the OSA review. The OSA retained the ultimate authority over the auditing function, including the authority to determine whether an audit is adequate.

In May 2015, the Minnesota Legislature passed, and Governor Dayton signed into law, S.F. 888, the State Government Finance Omnibus Bill. See 2015 Minn. Laws. ch. 77, at 1373-1449 (chapter 77). In addition to authorizing appropriations for state

---

1. The state auditor is also authorized to audit other political subdivisions, including cities and school districts. See Minn. Stat. §§ 6.49-.51 (2016). And the state auditor is charged with collecting information regarding reve-

nues and expenditures from political subdivisions and compiling an annual report for submission to the legislative auditor and other interested persons. Minn. Stat. § 6.74-.75 (2016).

government, chapter 77 included provisions requiring counties to undergo annual audits and authorizing counties to choose whether to have the OSA or a private CPA firm perform these audits. *See* 2015 Minn. Laws ch. 77, art. 2, § 3, at 1390. These new provisions were codified at Minn. Stat. § 6.481 (the county audit statute) and became effective on August 1, 2016. Chapter 77 repealed a predecessor statute governing county audits, Minn. Stat. § 6.48 (2014). *See* 2015 Minn. Laws ch. 77, art. 2, § 88(b), at 1432 (repealer).

Following passage of the county audit statute, the OSA sent notices to counties regarding the 2015-17 audit cycle, advising 61 counties that the OSA would conduct their audits. For the first time, the OSA sent out three-year contracts with the notices. Citing the new county audit statute, numerous counties, including respondents, refused to commit to a three-year contract with the OSA. Wright and Becker Counties notified the OSA of their intent to hire private CPA firms, but ultimately allowed the OSA to conduct their 2015 audits. Ramsey County did not state an intent to hire a private CPA firm, but declined to sign a three-year contract, preferring a year-to-year approach due to concerns about rising costs of the OSA-conducted audits if more counties elected to use private CPA firms.

In February 2016, the state auditor commenced a declaratory-judgment action against Wright, Becker, and Ramsey Counties.[2] The state auditor sought declarations that the county audit statute must be interpreted consistent with the state auditor's exercise of her core function of

auditing counties, and, if it cannot be so interpreted, that it violates Minn. Const. art. III, § 1, and art. V, § 1; and that the county audit statute is void because it was enacted as part of chapter 77, which combined multiple dissimilar subjects in violation of Minn. Const. art. IV, § 17 (the Single Subject Clause).

After the district court denied the counties' motions to dismiss on justiciability grounds, the state auditor moved for summary judgment. The district court granted in part and denied in part that motion, ruling that auditing counties is a core function of the OSA but that the county audit statute permissibly modifies that function, and ruling that chapter 77 does not violate the Single Subject Clause because the various topics of the session law are connected by the common thread of state government operations.

The state auditor appealed, and the counties filed notices of related appeals—Ramsey County as to the district court's denial of its motion to dismiss on justiciability grounds and Wright and Becker Counties as to the district court's determination that auditing counties is a core function of the OSA.[3]

## ISSUES

I. Does the county audit statute violate the Minnesota Constitution by removing core functions from the state auditor?

II. Did the Minnesota Legislature violate the Single Subject Clause of the Minnesota Constitution by including

---

**2.** The state auditor also sued the State of Minnesota, but voluntarily dismissed the state from this action by stipulation with the Office of the Attorney General.

**3.** The state auditor and the counties filed petitions for accelerated review, which the su-

preme court denied. This court granted amicus status to the Association for Government Accountability, and to the American Civil Liberties Union of Minnesota, Professor David Schultz, Growth & Justice, Honorable Jack Davies, and Jewish Community Action.

the county audit statute in chapter 77?

III. Are the state auditor's claims against Ramsey County justiciable?

## ANALYSIS

 In an appeal from summary judgment involving no dispute of material fact, this court reviews whether the district court erred in its application of the law. *Associated Builders & Contractors v. Ventura*, 610 N.W.2d 293, 298 (Minn. 2000). We review de novo the constitutionality of statutes, "proceed[ing] on the presumption that Minnesota statutes are constitutional and that our power to declare a statute unconstitutional should be exercised with extreme caution." *Id.* at 298-99. A party challenging the constitutionality of a statute "must meet the very heavy burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional." *Id.* at 299.

## DECISION

### I. The county audit statute does not violate article III of the Minnesota Constitution.

Article III of the Minnesota Constitution provides:

The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.

Minn. Const. art. III, § 1. Article V establishes the executive department, providing

that it "consists of a governor, lieutenant governor, secretary of state, auditor, and attorney general, who shall be chosen by the electors of the state." Minn. Const. art. V, § 1. Article V further provides that "[t]he duties and salaries of the executive officers shall be prescribed by law," Minn. Const. art. V, § 4, but it "does not expressly detail, with the exception of the governor, the duties of [executive] officers." *State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777, 780 (Minn. 1986).

In *Mattson*, the Minnesota Supreme Court considered a separation-of-powers challenge to legislation that removed functions from the state treasurer, who was at that time a constitutional executive officer.[4] *Id.* at 778. The supreme court acknowledged that article V did not detail the state treasurer's duties and that the "prescribed-by-law provision" authorized the legislature to establish those duties. *Id.* at 780. But the supreme court embraced caselaw from other jurisdictions that "consistently held that the prescribed-by-law provision does not allow a state legislature to transfer inherent or core functions of executive officers to appointed officials." *Id.* at 780-81 (citing *Hudson v. Kelly*, 76 Ariz. 255, 263 P.2d 362 (1953); *Love v. Baehr*, 47 Cal. 364 (1874); *Am. Legion Post No. 279 v. Barrett*, 371 Ill. 78, 20 N.E.2d 45 (1939); *Ex parte Corliss*, 16 N.D. 470, 114 N.W. 962 (1907)).

The *Mattson* court explained:

Although the prescribed-by-law provision of Article V affords the legislature the power, in light of public health and welfare concerns, to modify the duties of the state executive officers, it does not authorize legislation ... that strips such an office of all its independent core func-

---

4. The Office of State Treasurer was abolished pursuant to a 1998 constitutional amendment. *See* 1998 Minn. Laws ch. 387; *Canvassing Bd. Report State Gen. Election*, Nov. 3, 1998, *available at* http://www.sos.state.mn.us/elections-voting/1998-generalelection-results/1998-canvassing-board/.

tions. The mandate in Section I of Article V, that the executive department shall consist of a governor, lieutenant governor, secretary of state, auditor, treasurer and attorney general, implicitly places a limitation on the power of the legislature, under Section 4 of Article V, to prescribe the duties of such offices. The limitation is implicit in the specific titles the drafters gave to the individual offices.

*Id.* at 782.

The legislation at issue in *Mattson* transferred all but the most minor of the state treasurer's duties to an appointed commissioner of finance. *Id.* In particular, the legislation "transfer[red] all of the State Treasurer's independent power over the receipt, care and disbursement of state monies, functions that constitute the very core of the office." *Id.* "The[ ] very minor duties aside," the court noted, "there is little doubt that the Office of State Treasurer now stands as an empty shell." *Id.* Accordingly, the court held that the legislation violated the Minnesota Constitution.

In so holding, however, the *Mattson* court noted that "[t]he limitation implicit in Section I of Article V serves only to prevent the legislature from abolishing all of the independent functions inherent in an executive office." *Id.* The court continued: "This is not to say that the legislature could not name officials to perform some of the core functions of an executive office; core functions of such offices can be shared with statutory officials." *Id.*

The parties agree that *Mattson* governs our analysis of whether the county audit statute violates article III. The counties argue that the district court erred by determining that auditing counties is a core function of the state auditor. The state auditor challenges the district court's conclusion that the county audit statute merely modified, but did not transfer, that core

function. We address each argument in turn.

## A. Auditing counties is a core function of the state auditor.

■ There is no dispute that overseeing county finances is a primary duty of the state auditor. *See, e.g.,* Minn. Stat. § 6.481, subd. 1 (providing that powers and duties of state auditor shall be exercised with respect to counties of the state). But the counties assert that the actual task of conducting county audits is not a core function. We disagree.

To determine core functions, *Mattson* instructs us to consider the functions of the state auditor in the time period preceding and contemporaneous to the 1857 adoption of the Minnesota Constitution. *See Mattson,* 391 N.W.2d at 782 (focusing on framers' intent to determine core functions of state treasurer). The state auditor presented evidence—including early Minnesota statutes and an 1858 letter requesting county financial records written by Minnesota's first state auditor, W.F. Dunbar—demonstrating that responsibility for auditing county finances was assigned to the territorial auditor and then the state auditor during that period. In other words, the drafters of our constitution would have had the county-audit function in mind when they created the office of the state auditor. *See Hudson,* 263 P.2d at 365-366 (noting that "[t]he duties of the officer now are and always have been those of general accountant of the state" and recounting historical understanding of role of an auditor), *cited in Mattson,* 391 N.W.2d at 780; *Wright v. Callahan,* 61 Idaho 167, 99 P.2d 961, 964 (1940) ("At the time of the adoption and ratification of our Constitution the terms 'state auditor' and 'controller,' as evidenced by the constitutions and statutes of that period, were generally and commonly understood to connote a supervising officer of revenue whose duties were to audit all claims against the state.").

The counties urge us to instead focus on the subsequent creation of a public examiner, a statutory executive officer who was responsible for conducting county audits between 1878 and 1973, as indicative that performing county audits is not a core function of the state auditor. *See* Minn. Stat. § 215.11 (1971) (providing for audits of counties by public examiner); Minn. Stat. § 6.46 (2016) (transferring duties of public examiner in relation to counties to state auditor). The Supreme Court of Idaho rejected a similar argument in *Williams v. State Legislature of Idaho*, holding that the legislature could not prohibit the state auditor from conducting post-audits because this function was "characteristic" of the office of auditor and thus could not be removed. 111 Idaho 156, 722 P.2d 465, 469 (1986). This was so even though the legislature had performed the function for years, because "the [l]egislature may not usurp the power of a constitutionally created executive agency, whether or not the power has been exercised." *Id.* Similarly here, we are not persuaded by the counties' argument about the public-examiner role. The fact that the public examiner performed county-audit functions for an extended period of time, apparently without a legal challenge, does not mean that the transfer of duties passed constitutional muster. And it does not defeat our conclusion that our constitutional framers intended auditing counties to be a core function of the state auditor. In sum, auditing the finances of Minnesota counties is a core function of the state auditor.

## B. The county audit statute permissibly modifies the state auditor's core function of auditing counties.

In determining whether the county audit statute impermissibly transfers the state auditor's independent county-audit functions or merely modifies them, we first compare the current statute, Minn. Stat. § 6.481 (2016), to the prior statute, Minn. Stat. § 6.48 (2014). Both statutes provide that "[a]ll the powers and duties conferred and imposed upon the state auditor shall be exercised and performed by the state auditor in respect to the offices, institutions, public property, and improvements of [the] several counties of the state." And both statutes require the state auditor to "prescribe and install systems of accounts and financial reports that shall be uniform, so far as practicable, for the same class of offices." Minn. Stat. § 6.48; Minn. Stat. § 6.481, subd. 1.

But there are material differences between the two statutes. Under the predecessor statute:

> At least once in each year, if funds and personnel permit[ted], the state auditor [could] visit, without previous notice, each county and make a thorough examination of all accounts and records relating to the receipt and disbursement of the public funds and custody of the public funds and other property.

Minn. Stat. § 6.48. The county audit statute effectuates two changes: counties are now required to undergo annual audits, and they may choose to have the audit performed by the OSA or a private CPA firm. But the county audit statute retains language authorizing the state auditor to "visit, without previous notice, each county and examine all accounts and records relating to the receipt and disbursement of the public funds and the custody of the public funds and other property." Minn. Stat. § 6.481, subd. 1.[5]

Moreover, the county audit statute does not disturb the state auditor's ultimate authority to oversee county finances:

---

5. The county audit statute allows the state auditor "to examine" as opposed to

The state auditor may require additional information from the CPA firm if the state auditor determines that is in the public interest, but the state auditor must accept the audit unless the auditor determines it does not meet recognized industry auditing standards or is not in the form required by the state auditor. The state auditor may make additional examinations as the auditor determines to be in the public interest.

Minn. Stat. § 6.481, subd. 3. The predecessor statute—which contemplated that county audits may be performed by private CPA firms but did not authorize counties to elect a private audit—likewise provided that the state auditor "may require additional information from the private certified public accountant as the state auditor deems to be in the public interest" and may "make additional examinations as the state auditor determines to be in the public interest." Minn. Stat. § 6.48.

We next consider the state auditor's argument that the substantial negative financial impact of the county audit statute renders it unconstitutional under *Mattson*. The supreme court noted in *Mattson* that the statute at issue reduced the treasurer's annual budget from $584,600 in 1985 to $162,600 and $163,700 for 1986 and 1987. 391 N.W.2d at 779-80 n.3. The state auditor contends that because more than 60% of the OSA's current budget is derived from county audit fees, the impact of the county audit statute is "on par with the 70 percent budget impact in *Mattson*." This argument is unavailing. First, the statute at issue in *Mattson* expressly eliminated staff positions within the state treasurer's office and substantially reduced funding to the office. The county audit statute does not decrease the OSA staffing or budget over the previous biennium.[6] Second, and more importantly, the *Mattson* court referred to the funding decrease in a footnote; the court's constitutional analysis focused exclusively on the fact that the challenged statute removed all of the state treasurer's core functions. *E.g.*, *id.* at 782 ("The limitation implicit in Section I of Article V serves only to prevent the legislature from abolishing all of the independent *functions* inherent in an executive office." (emphasis added) and "By statutorily abolishing all of the *independent core functions* of a state executive office, the legislature, in effect, abolishes that office, and the will of the drafters, as expressed in Article IX, is thereby thwarted." (emphasis added)).

Having carefully reviewed the changes effected by the county audit statute, we conclude that it does not violate article III of the Minnesota Constitution. Although counties now have the option of enlisting the state auditor or a private CPA firm to perform audits, the statute does not disturb the state auditor's ultimate authority as the state's general accountant. The state auditor remains empowered to set uniform standards for auditing counties and ensure compliance with those standards. Minn. Stat. § 6.481, subd. 1. Moreover, the state auditor remains authorized to visit counties, without notice, for the purpose of examining their records; to re-

---

"mak[ing] a thorough examination of" county records. *Compare* Minn. Stat. § 6.481, subd. 1 *with* Minn. Stat. § 6.48.

6. Appropriations to the OSA from the general fund did substantially decrease for the 2013-2014 biennium, following the creation of the State Auditor Enterprise Fund. The state auditor predicts that a loss of county funding due to private audits will cripple her office financially. But the state auditor has not argued a present constitutional violation based on a failure to sufficiently fund her office. On this record, it would be speculative and premature for us to consider a claim based on lack of funding.

quire additional information from CPA firms conducting county audits; and to make additional examinations as she determines to be in the public interest. *Id.*, subds. 1, 3. Thus, although the state auditor may be precluded from initially performing required annual audits based on county preference, she retains substantial authority over the conduct of those audits, including the authority to perform auditing functions that she determines to be in the public interest. *See Mattson*, 391 N.W.2d at 782 (noting that "[t]he limitation implicit in Section I of Article V serves only to prevent the legislature from abolishing all of the independent functions inherent in an executive office"). In sum, the county audit statute permissibly modifies, rather than transfers, the state auditor's core functions.

## II. The Minnesota Legislature did not violate the Single Subject Clause of the Minnesota Constitution by including the county audit statute in chapter 77.

■ The Single Subject Clause provides that "[n]o law shall embrace more than one subject." Minn. Const. art. IV, § 17.[7] Minnesota applies the germaneness test to determine whether a law violates the Clause, broadly construing the term "subject." *Johnson v. Harrison*, 47 Minn. 575, 577, 50 N.W. 923, 924 (1891).

All that is necessary is that [the] act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as

to be parts of, or germane to, one general subject.

*Id.*

■ The constitutional framers adopted the Single Subject Clause to guard against logrolling, "the practice of combining various unpopular laws and including them in an unrelated, but more popular law." *Townsend v. State*, 767 N.W.2d 11, 13 (Minn. 2009). But the Clause was "not intended to preclude the enactment of comprehensive legislation addressing *related* topics within a general subject area." *Unity Church v. State*, 694 N.W.2d 585, 592 (Minn. App. 2005). Accordingly, the bundling of popular and unpopular provisions is permissible so long as the provisions are germane to one another. *See id.* at 592 n.3.

With the exception of some successful challenges to legislation in the late 1800s and early 1900s, our supreme court generally has rejected single-subject challenges. *See Associated Builders*, 610 N.W.2d at 299-302 (tracing history of court's decisions under the clause). Starting with the *Mattson* decision in 1986, however, members of the court in concurring opinions have expressed their growing frustration with the legislature's conduct in grouping tangentially related subjects in large bills. *See id.* at 301-02. Notwithstanding these warnings by individual members of the court, however, the court's majority decisions continued to reject challenges under the Single Subject Clause. *Id.*

In *Blanch v. Suburban Hennepin Reg'l Park Dist.*, the supreme court upheld a law authorizing a county park district to acquire land that was passed as part of an omnibus appropriations bill directed to the

---

7. In full, article IV, section 17 states: "No law shall embrace more than one subject, which shall be expressed in its title." The first clause is referred to as the Single Subject Clause, and the second clause the Title Clause. The

two clauses "serve independent though interrelated purposes." *Wass v. Anderson*, 312 Minn. 394, 398, 252 N.W.2d 131, 134 (1977). The Title Clause is not at issue in this appeal.

organization and operation of state government. 449 N.W.2d 150, 155 (Minn. 1989). The court explained:

> The common thread which runs through the various sections of chapter 686 is indeed a mere filament. Were we not of the opinion that the park bill, designed to make possible the utilization of funds appropriated in the preceding session of the legislature, is germane to the broad subject of appropriations for the operation of state government, we would, despite our long-standing tradition of deference to the legislature, be compelled to declare it violative of art. 4, § 17, and, hence, unconstitutional and void.

*Id.* From this passage in *Blanch* is drawn the "mere filament" test for determining whether a law violates the Single Subject Clause.

The breadth of the "mere filament" test is not unlimited. In *Associated Builders*, the supreme court held invalid under the Single Subject Clause a prevailing-wage amendment passed as part of an omnibus tax relief and reform bill. 610 N.W.2d at 302. The amendment required school districts to pay the prevailing wage in connection with large construction or remodeling projects. The supreme court rejected arguments that the prevailing-wage amendment related to the general subject of tax relief and the "operation of state and local

government," reasoning that "[w]hile the amendment may have a tax impact by affecting construction costs, clearly that is not its purpose and nowhere is consideration of tax relief mentioned in its very short text." *Id.* at 302.[8] And the court concluded that "to construe an amendment requiring prevailing wages that lacks any express limitation to public funding as related to the subject of financing and operation of state and local government would push the mere filament to a mere figment." *Id.* at 303.

Following the supreme court's guidance, we turn to the state auditor's arguments. The general subject of chapter 77 is "[a]n act relating to the operation of state government." The state auditor first argues that the "mere filament" test is not satisfied because the operation of state government is too broad a category to serve as a single subject.[9] We are not persuaded. Contrary to the state auditor's contention, *Associated Builders* did not hold that state government finance is too broad a category. Rather, the supreme court concluded that the connection between the category of tax relief and government operations and a requirement that school districts pay prevailing wages on large construction projects was too tenuous to meet the Single Subject Clause. Moreover, in *Blanch*,

---

8. The *Associated Builders* decision separately held that the prevailing-wage amendment violated the Title Clause of section 17 because nowhere in the title was there "a reference to labor, wages, school construction or a myriad of other words that would suggest that it contains a provision having a potentially significant impact on the cost of school construction." *Id.* at 304.

9. Amici ACLU of Minnesota et al. urge this court to adopt a more stringent standard than the "mere filament" test or to hold that laws passed as part of biennial appropriations bills expire along with the appropriations in those bills. Such holdings would be beyond the pur-

view of this court. *See State v. Dorn*, 875 N.W.2d 357, 361 (Minn. App. 2016) (noting that, as an error-correcting court, this court lacks authority to change established supreme court precedent), *aff'd*, 887 N.W.2d 826 (Minn. 2016); *State v. Kelley*, 832 N.W.2d 447, 456 (Minn. App. 2013) ("This is an error-correcting court, and we apply the best law available to us."), *aff'd*, 855 N.W.2d 269 (Minn. 2014); *Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn. App. 1987) ("[T]he task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court."), *review denied* (Minn. Dec. 18, 1987).

the supreme court approved the inclusion in an omnibus appropriations bill of language authorizing a park district to acquire land, reasoning that it was "germane to the broad subject of appropriations for the operation of state government." 449 N.W.2d at 155. In short, the state auditor points us to no authority—and we are aware of none—suggesting that the topic of state government operations is too broad to comply with the Single Subject Clause.

The state auditor next contends that *Associated Builders* requires us to analyze chapter 77's legislative history to determine whether it was the subject of impermissible logrolling. This argument is unavailing. By its terms and under the caselaw, the Single Subject Clause requires no more than germaneness. *See, e.g., Unity Church*, 694 N.W.2d at 597 ("What the Minnesota Constitution requires is germaneness. It does not require the absence of legislative maneuvering to enact unpopular, but germane, bills.").

Finally, the state auditor asserts that the county audit statute is constitutionally infirm because other provisions in chapter 77 are not germane to the operation of state government. Notably, the state auditor does not argue that the county audit statute is unrelated to this broad subject. Nor does she challenge the constitutionality of what she asserts are the nongermane portions of chapter 77. Even if we were to determine that other provisions were not germane to the general subject of chapter 77, the appropriate remedy would be to strike *those* provisions. *See Associated Builders*, 610 N.W.2d at 307 (declining to strike entire bill based on single-subject violations and explaining that "[w]here the common theme of the law is clearly defined by its other provisions, a provision that does not have any relation to that common theme is not germane, is void, and

may be severed"); *Unity Church*, 694 N.W.2d at 598 (noting that "Minnesota courts have historically severed the *challenged* section, leaving the rest of the law intact"). Accordingly, we need not address whether other identified, but not challenged, provisions of chapter 77 are germane to its general subject—state government operations.

In sum, we are not persuaded that including the county audit statute in chapter 77 violates the Single Subject Clause. The fact that the county audit statute imposes the duty to obtain annual audits on counties—not the state—does not change our analysis. The bill's title states that it relates to "allowing counties to elect to have an audit conducted by a CPA firm," alerting the reader to the relationship between county and state operations. And, as noted above, the county audit statute formalizes the shared county-and-state responsibility for conducting county audits that has been in effect for more than a decade. A county's decision to hire a private CPA firm will impact the OSA's workload, but the state auditor retains final authority over the form and process for conducting audits. This interplay, which implicates funding and policy, persuades us that the mere filament test is satisfied.

### III. The state auditor's claims against Ramsey County are justiciable.

The Minnesota Declaratory Judgments Act, Minn. Stat. §§ 555.01-.16 (2016), permits an interested person to have his or her rights declared under a statute or other writing. Minn. Stat. § 555.02. "The policy behind the declaratory judgment act is to allow parties to determine certain rights and liabilities pertaining to an actual controversy *before* it leads to repudiation of obligations, invasion of rights, and the commission of wrongs." *Metro. Sports Facilities Comm'n v. Minn.*

*Twins P'ship*, 638 N.W.2d 214, 227 (Minn. App. 2002) (emphasis added), *review denied* (Minn. Feb. 4, 2002).

But a district court "has no jurisdiction over a declaratory judgment proceeding unless there is a justiciable controversy." *Onvoy, Inc. v. ALLETE, Inc.*, 736 N.W.2d 611, 617 (Minn. 2007). "A justiciable controversy exists if the claim (1) involves definite and concrete assertions of right that emanate from a legal source, (2) involves a genuine conflict in tangible interests between parties with adverse interests, and (3) is capable of specific resolution by judgment rather than presenting hypothetical facts that would form an advisory opinion." *Id.* at 617-18. Stated another way, in a declaratory-judgment action, the

> [c]omplainant must prove his possession of a legal interest or right which is capable of and in need of protection from the claims, demands, or objections emanating from a source competent legally to place such legal interest or right in jeopardy. Although complainant need not necessarily possess a cause of action (as that term is ordinarily used) as a basis for obtaining declaratory relief, nevertheless he must, as a minimum requirement, possess a bona fide legal interest which has been, or with respect to the ripening seeds of a controversy is about to be, affected in a prejudicial manner.

*Kennedy v. Carlson*, 544 N.W.2d 1, 6 (Minn. 1996) (quotation omitted). "Justiciability is an issue of law that we review de novo." *McCaughtry v. City of Red Wing*, 808 N.W.2d 331, 337 (Minn. 2011).

Ramsey County argues that there is no justiciable controversy between it and the state auditor because it has not yet decided whether it will choose to use a private CPA firm to conduct its future audits. We disagree.

Although Ramsey County has not yet stated an intent to hire a private CPA firm to conduct its audits, it denied the state auditor's request to sign a contract for the 2015-17 audit cycle, contending that it has the right to elect a private audit. In so doing, Ramsey County asserted rights emanating from the county audit statute that conflict directly with the state auditor's assertion of rights emanating from the Minnesota Constitution. These conflicting assertions of rights demonstrate the existence of a justiciable controversy that is ripe for determination under the Minnesota Declaratory Judgments Act.

Ramsey County also asserts that its dispute with the state auditor is not ripe because it has not yet determined whether it will elect a private audit and thus that any potential injury to the state auditor is hypothetical. But the alleged constitutional injury to the state auditor stems not only from the financial harm to the OSA that would occur if a significant number of counties opt for private audits, but also from the removal of the state auditor's authority to determine which counties will be directly audited by the state auditor. This is not a case where the injury is hypothetical and may or may not come to pass. Accordingly, the district court did not err by denying Ramsey County's motion to dismiss on justiciability grounds.

### DECISION

Minn. Stat. § 6.481 does not violate Minn. Const. art. III, § 1, and was not adopted in violation of the Single Subject Clause of the Minnesota Constitution. The state auditor's claims against Ramsey County are justiciable. Accordingly, we affirm the judgment entered in favor of Wright, Becker, and Ramsey Counties.

**Affirmed.**

CLEARY, Chief Judge (dissenting)

I respectfully dissent from the majority's conclusion that Minn. Stat. § 6.481 (2016) does not violate the separation-of-powers requirements of article III, section 1 of the Minnesota Constitution. While I agree with the majority's conclusion that auditing counties is a core function of the state auditor vested in her constitutional office by the framers of the Minnesota Constitution, I disagree with the majority's conclusion that Minn. Stat. § 6.481 merely modifies that core function in a manner that is consistent with the Minnesota Constitution.

As the majority acknowledges, the Office of the State Auditor (OSA) devotes substantial resources to auditing state counties. Sixty-four percent of the OSA's staff either audits counties or supports the OSA's county-audit function. The state auditor reports that currently 60% of the OSA's budget is derived from county-audit fees. In 2013, the legislature established the State Auditor Enterprise Fund, a dedicated fund for collected fees paid by counties and other political subdivisions for direct allocation to the OSA. See 2013 Minn. Laws ch. 142, art. 3, § 13, at 2412-13 (codified at Minn. Stat. § 6.581 (2016)). Following the establishment of this fund, general-fund appropriations to the OSA have fallen by more than 75%. Having rendered the OSA largely dependent on the dedicated fund, the legislature then passed the county audit statute in 2015. Minn. Laws ch. 77, art. 2, § 3, at 1390-91 (codified at Minn. Stat. § 6.481). This statute allows counties to bypass the state auditor in having audits conducted, undermining the primary source of funding for the OSA and stripping from the OSA the ultimate authority to determine which counties will be audited by the OSA and which must use a private certified public accounting (CPA) firm. Minn. Stat. § 6.481.

The state auditor anticipates that, if 50 counties elect private CPA audits under the county audit statute, annual payments to the State Auditor Enterprise Fund will decrease by approximately $3.9 million, reducing the OSA's total budget by at least 44% and requiring the OSA to conduct substantial layoffs. The state auditor further explains that the revenue losses would be self-perpetuating because the staff reductions would cause a loss of valuable experience and economies of scale, necessitating higher audit rates to remaining counties, which would encourage additional counties to elect private CPA audits, creating a death spiral for the constitutional office. Ramsey County has articulated concerns about rising rates under this scenario as a basis for declining to commit to OSA audits for the 2015-2017 audit cycle. It appears likely that other counties may also do so in the future, suggesting that the OSA is heading inexorably to the "empty shell" status of the State Treasurer's Office characterized in *State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777, 782 (Minn. 1986).

Against this backdrop, I would conclude that the county audit statute deprives the state auditor of her primary core function in a manner that violates the Minnesota Constitution. As our supreme court recognized in *Mattson*, "the prescribed-by-law provision does not allow a state legislature to transfer inherent or core functions of executive officers to appointed officials." *Id.* at 780. *Mattson* involved the transfer of substantially all of the duties of the state treasurer, which the supreme court held impermissible. *Id.* at 782-83. Although *Mattson* contemplates that some modification of a constitutional officer's functions may be permissible, a mere modification was not at issue in *Mattson* nor is it at issue here. *See id.* at 782 (explaining that the legislature may modify executive offi-

cers' duties in light of public health and welfare concerns). Cases from other jurisdictions relied on by *Mattson* have more broadly prohibited the removal of core functions in any respect. *See Hudson v. Kelly*, 76 Ariz. 255, 263 P.2d 362, 369 (1953) ("[T]he legislature has no power to take from a constitutional officer the substance of the office itself, and transfer it to another who is to be appointed in a different manner and will hold the office by a different tenure from that which is provided for by the constitution."); *Ex parte Corliss*, 16 N.D. 470, 114 N.W. 962, 965 (1907) (denying the legislature "power to strip such offices, even temporarily, *of a portion of their inherent functions*" (emphasis added)).

*Mattson* may leave open the question of when the modification of the authority of a constitutional office is acceptable and when it goes too far, in violation of the separation-of-powers requirements of Minn. Const. art. III, § 1, but I do not believe that the immediate and complete abolishment of a constitutional office is required to find a constitutional violation. The legislature's removal of auditing duties from the state auditor, stripping much of the authority and the primary core function from the office and crippling the funding of the OSA in the process, is more than a mere modification of the authority of a constitutional office—it is the dismantling of a constitutional office. To some, there may appear to be a distinction between the demolishing of a constitutional office and the dismantling of that office, but it is a false distinction as the eventual outcome is preordained: the OSA, like the State Treasurer's Office before it, will ultimately be relegated to a mere shadow of what the framers of the Minnesota Constitution intended when the office was created. What the court stated in *Mattson*, relative to the State Treasurer's Office, applies equally to the State Auditor's Office: "If the position

is no longer warranted for the efficient administration of state government, the legislature can present to the people, in accordance with Article IX, a constitutional amendment eliminating the office." *Mattson*, 391 N.W.2d at 783.

I would affirm the district court's ruling that auditing counties is a core function of the OSA, but I would reverse the district court's ruling that the county audit statute, Minn. Stat. § 6.481, permissibly modifies the auditing core function of the OSA.